## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GLORIA J. GARNER, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 3:2005-0382 |
| | ) | |
| vs. | ) | |
| | ) | |
| WARD CORPORATION | ) | JUDGE GIBSON |
| OF PENNSYLVANIA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

### I. INTRODUCTION

This is a civil action based upon a claim of employment discrimination. Plaintiff, Gloria Garner (hereinafter "Plaintiff"), a former employee of Defendant, Ward Corporation of Pennsylvania (hereinafter "Defendant" or "Ward Corp."), alleges that Ward Corp. discriminated against her on the basis of her age and terminated her employment in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*., and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951.[1]

Defendant moved for summary judgment (Doc. No. 19). Plaintiff contends that there is more than sufficient direct evidence showing that Defendant discriminated against her on the basis of age, which warrants the denial of Defendant's motion for summary judgment. Defendant asserts the contrary, arguing that Plaintiff only has indirect evidence of discrimination which does not establish that Defendant terminated Plaintiff's employment due to age. As relief

---

[1]Claims under the PHRA are determined in accordance with its federal counterpart, the ADEA. *See Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir. 1996); *Bernard v. Bethenergy Mines, Inc.*, 837 F. Supp. 714, 715 (W.D.Pa. 1993), *aff'd*, 31 F.3d 1170 (3d Cir. 1994).

for her claims, Plaintiff seeks reinstatement, recovery of back pay, and compensatory and punitive damages.

After careful consideration of Defendant's motion for summary judgment, Plaintiff's response, the memoranda of law in support, and the record properly before the Court, and for the reasons that follow, this Court **DENIES** Defendant's motion for summary judgment.

## II.  UNDISPUTED FACTUAL HISTORY[2]

Ward Corp. started its operations in 1976 with Michael E. Ward (hereinafter "Ward") at the helm as President. Doc. No. 20, ¶ 2. Ward Corp. has a Hertz rental car franchise ("Hertz franchise") and also operates a warehouse facility. Doc. No. 20, ¶¶ 1, 7. Plaintiff started working for Ward Corp. on February 17, 1992 as a rental clerk in the Hertz franchise. Her duties, which initially included bookkeeping, increased over time. Doc. No. 20, ¶ 4. Plaintiff

---

[2]As dictated by Local Rule 56.1(B) and (C), the parties were required to separately file a Concise Statement of Facts and an Appendix that would be referenced in the Concise Statement of Facts. Accordingly, the Court has gleaned the following factual background from Defendant's Statement of Uncontested Facts (Doc. No. 20) and from additional fact statements set forth by Plaintiff in her response (Doc. No. 27), to Defendant's Statement of Uncontested Facts, to the extent the same are fully supported by the record in this case. If a proposed fact of the parties is not included herein, it was considered to be in dispute by the Court.

Additionally, the Court notes Defendant's failure to adhere to the Court's Case Management Order (Doc. No. 8) which directed Defendant to use letters to designate its exhibits as opposed to the use of numbers which was reserved for Plaintiff. As this was not the case, the Court shall cite to the parties exhibits utilizing the document number, the designation of whether the exhibit was presented by Plaintiff or Defendant, the exhibit number and the relevant pages. Thus, citations to the parties' exhibits shall be stated as follows: Doc. No. 21, Def.'s Ex. 6 at 5-8 or Doc. No. 28, Pl.'s Ex. 12 at 6-7.

The Court is also troubled by Defendant's frequent mis-characterization of the facts as stated in the referenced exhibits and its failure to cite to the correct portion of the record. See Paragraph No. 3 in the Defendant's Statement of Uncontested Facts (Doc. No. 20) wherein Defendant states that one of Ward Corp.'s franchises has netted an annual profit throughout the corporation's thirty (30) year history. In actuality, the president of Ward Corp. testified that this particular franchise has never made any money. Doc. No. 21. Def.'s Ex. 7 at 24. See Paragraph No. 8 in Defendant's Statement of Uncontested Facts (Doc. No. 20 at 4), in which Defendant references Doc. No. 21, Def.'s Ex. 5 at 5 and states that it contains a statement uttered by Plaintiff when in fact, it is merely a portion of the table of contents. See also Doc. No. 21, Def.'s Ex. 8 at 12, where Defendant states that the president of Ward Corp. was not aware of Plaintiff's specific duties when it is evident that the president testified to the exact opposite. See also Statement No. 30 in Defendant's Statement of Uncontested Facts (Doc. No. 20 at 6), where Defendant states that Plaintiff was the highest-paid, non managerial individual in Ward Corp. and her position title was that of an accountant. As support for Paragraph No. 30, Defendant refers to its Exhibit 13 (Doc. No. 21). Exhibit 13 is indeed a list of Ward Corp.'s employees, however Plaintiff is not listed anywhere in this exhibit nor does the list contain information about the employees' salaries. Consequently, some of the facts as set forth have been modified by the Court to conform such proposed facts to the exhibits upon which the proposed facts rely. This was done to ensure that the proposed fact does not misconstrue the evidence supporting it.

became a notary when Ward Corp. paid for her to obtain her license. Her notary duties included assisting in the work required for the Hertz franchise, such as registering, purchasing and selling vehicles.

Mark Fusco (hereinafter "Fusco") began to work as a comptroller for Ward Corp. on January 14, 2000. Doc. No. 20, ¶ 7. His focus lied primarily with the warehouse, which was the largest of Ward Corp.'s three (3) divisions. *Id.* Fusco was Plaintiff's direct supervisor when he started as comptroller, but that changed when he became the general manager; after Fusco's promotion, Charlene Troxel (hereinafter "Troxel") supervised Plaintiff in her bookkeeping duties and Christine Long (hereinafter "Long") supervised her in relation to personnel matters. Doc. No. 21, Def.'s Ex. 6 at 8, 14, 16, 21, and 27; Doc. No. 21, Def.'s Ex. 37 (a timeline of Plaintiff's supervisors during her tenure at Ward Corp.). Fusco admitted to, and Plaintiff attested to, his lack of knowledge of and experience with the car rental business. Doc. No. 20, ¶ 8. Fusco does not recall having any problems with Plaintiff's bookkeeping duties. *Id.* ¶ 9. He did not make any complaints to Ward about Plaintiff's bookkeeping errors. *Id.* ¶ 22. Any performance problems or complaints would have been addressed by either Troxel or Long. Doc. No. 21, Def.'s Ex. 6 at 8, 14, 16, 21, and 27.

Plaintiff received a letter of commendation on March 9, 1999, signed by her supervisor at the time, Brian McFarland (hereinafter "McFarland") and President Ward. Doc. No. 20, ¶ 12. The letter praised Plaintiff's performance and informed her of a raise and the use of the company car for banking errands and mail delivery. Doc. No. 21, Def.'s Ex. 44; Doc. No. 28, Pl.'s Ex. 8. Ward testified that he had no direct knowledge of Plaintiff's performance at the time of the commendation letter. Doc. No. 20, ¶ 12. He relied on the recommendation of McFarland for the commendation letter. *Id.* There are no other written evaluations of Plaintiff's performance.

Doc. No. 20, ¶ 14. Ward also testified that up until two (2) years ago, he was president of Ward Corp. "in name only" and had primarily worked for Ward Trucking. *Id.* However, Ward had knowledge of some of Plaintiff's specific duties; he testified Plaintiff's duties included paying bills, picking up and delivering mail, doing title work, registering vehicles, and fulfilling her notary duties. Doc. No. 21, Def.'s Ex. 8 at 12; Doc. No. 28, Pl.'s Ex. 6 at 5. Ward understood Plaintiff's role to be no more than that of a basic bookkeeper rather than an accountant. Doc. No. 21, Def.'s Ex. 8 at 12; Doc No. 28, Pl.'s Ex. 6 at 6. Fusco moved Plaintiff from the warehouse facility back to the Hertz franchise office on Plank Road. Doc. No. 20, ¶ 24. Fusco promoted Plaintiff to "office manager" and gave her a raise. *Id.*

When Rose McKay (hereinafter "McKay") first arrived at Ward Corp. on July 22, 2002, to work as the general manager of the Hertz franchise, she did not have any information on the job descriptions of Ward Corp. employees. Doc. No. 21, Def.'s Ex. 9 at 14. McKay met with employees to discuss their job descriptions and used the job-title list given to her as a frame of reference. McKay assumed Plaintiff was an accountant as that was her official job title. Doc. No. 20, ¶ 33.

McKay also alleges that she created a wish list of necessary tasks that she attempted to parse among the three office workers under her management: Plaintiff, Melissa Benson (hereinafter "Benson") and Monica Sonefelt (hereinafter "Sonefel t"). Doc. No. 20, ¶ 34. McKay attributed many mistakes to Plaintiff, including the inability to do basic bookkeeping functions and simple mathematical computations. Doc. No. 20, ¶ 35. McKay testified that Plaintiff failed to submit statements to Hertz in a timely manner, entered information in the wrong ledger, made errors in the motor vehicle title work, made improper tax calculations and depreciation values, and failed to track missing miles. Doc. No. 20 at ¶ 37.

4

One major example dealt with the overpayment of tax to Benner Township for a rental space Ward Corp. leased at the State College Airport. Doc. No. 20, ¶ 38. The lease was entered into on August 1, 1999. *Id.* McKay noted the large, recurring payment to Benner Township, investigated it and concluded that Ward Corp. had been grossly overpaying based on a percentage of the overall revenue instead of a percentage of the rent. *Id.* ¶ 40. The total amount overpaid was $24,155.57 between April 1997 and October 2002. *Id.* ¶ 43. Plaintiff prepared the monthly Benner County concession reports based on inaccurate information. *Id.* ¶ 44. Ward testified that he recalled that McKay complained on several occasions about Plaintiff's poor performance, including complaints about inaccurate reports prepared by Plaintiff and inaccurate calculations concerning the Benner Township concession reports. *Id.* ¶ 45. He also testified that he failed to correct McKay on Plaintiff's former (basic bookkeeping) duties before McKay's arrival. Doc. No. 27, ¶ 45; Doc. No. 21, Def.'s Ex. 6 at 69-71, 87. McKay also discovered that Ward Corp. failed to pay a quarterly tax to the Commonwealth, with a total of $40,000 owed. McKay became aware of the failure to pay the tax after receiving a notice of delinquency. Plaintiff was aware of the error and its inaccuracy in Ward Corp.'s books.

Jack Moyer (hereinafter "Moyer") is a car salesman at the Hertz franchise. Doc. No. 20, ¶ 49. He testified that Plaintiff made mistakes in submitted title paperwork which was later returned by the Pennsylvania Department of Transportation ("PennDOT"). *Id.* Moyer testified that PennDOT returned paperwork even for minor errors. Doc. No. 27, ¶ 51. He complained several times of having to use an outside company, Dunkle, for title work even though Plaintiff was a licensed notary. Doc. No. 20, ¶ 49. None of the title work performed by Dunkle was returned. *Id.* ¶ 50. Ward was made aware of the title work mistakes and Plaintiff admits to the

return of some of the title work. *Id.* ¶ 52. Ward was also aware of Plaintiff's title work mistakes. *Id.*

McKay claims that Plaintiff had issues with customer relations and believed that Sonefelt and Benson had superior dealings with the public and received compliments from customers. *Id.* ¶¶ 56, 57. Both Ward and Fusco testified that they were aware of ongoing customer complaints about Plaintiff; however, Fusco, Plaintiff's supervisor, never addressed the issue with Plaintiff. Doc. No. 20, ¶¶ 59, 60; Doc. No. 27, ¶¶ 59, 60.

Plaintiff testified that she believed her desk was in a position that was out of the way because McKay did not like the way Plaintiff looked. Doc. No. 20, ¶ 62. Plaintiff also claims that she felt left out and thought she did not belong. *Id.* ¶ 64. Plaintiff admitted that McKay recognized her birthday and gave her a Christmas gift. *Id.* McKay also gave Plaintiff a free rental car when her car was in the shop for repairs. *Id.*

McKay testified to meeting with President Ward and the Ward Trucking human resources director, Cora Kelley (hereinafter "Kelley") on August 7, 2003 ("August 2003 meeting"), to discuss McKay's continuing dissatisfaction with Plaintiff. Doc. No. 20, ¶ 73; Doc. No. 21, Def.'s Exhibit 41. McKay also prepared and sent an email to Kelley recording the issues discussed in the August 2003 meeting. *Id.* McKay gave Plaintiff a warning letter on August 8, 2003 ("August 2003 disciplinary letter") informing her that she had thirty (30) days to improve her performance or her employment would be terminated. Doc. No. 20, ¶ 74; Doc. No. 21, Def.'s Exhibit 42. McKay met with Plaintiff to discuss the letter. Doc. No. 20, ¶ 75. Plaintiff asserts that McKay indicated that she could take a kid "right out of school" or "off the street" that had more skills and would learn faster and for a lot less money than Plaintiff was making. *Id.* ¶ 77. Plaintiff testified that even if she had stayed on as a Ward Corp. employee and was

6

paid a lower salary, Ward Corp. would still have had to hire an accountant. *Id.* ¶ 78. Plaintiff was terminated on September 11, 2003 and Lisa Silvis (hereinafter "Silvis"),[3] who has a degree in accounting, was hired as a part-time comptroller. *Id.* ¶¶ 80, 82.

## III.    STANDARD OF REVIEW

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, the Court is obligated to "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007). The moving party's burden can be "discharged by 'showing'–that is, point out to the District Court–that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2458, 2554 91 L. Ed. 2d 265, 275 (1986). If the moving party meets this burden, the burden then shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986); *Petruzzi's IGA Supermarkets Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). "Such affirmative evidence–regardless of whether it is direct or circumstantial–must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Id. (citing Williams v. Borough of West Chester*, 891 F.2d 458, 460-461 (3d Cir. 1989)). When the non-moving party's evidence in opposition to a properly supported motion for summary

---

[3]The Court notes that "Lisa Silvas" and "Lisa Silvis" are used throughout the record to refer to the same woman. The Court will simply refer to her as "Lisa Silvis".

7

judgment is "merely colorable" or "not significantly probative," the court may grant summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202, 212 (1986).

## IV. DISCUSSION

Plaintiff asserts a claim of age discrimination under the ADEA and the PHRA. Both statutes prohibit an employer from discharging an employee because of age, if the employee is over forty (40) years old. 29 U.S.C. § 623(a)(1), 631(a); 43 P.S. § 954(h), 955(a). A plaintiff must offer proof that his or her age "actually motivated the employer's decision." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S. Ct. 2097, 2105, 147 L. Ed. 2d 105, 116 (2000). In other words, a plaintiff must show that his or her age "actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." *Id.* (internal citations omitted). The plaintiff meets this burden by (1) proffering direct evidence of discrimination as outlined in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775, 104 L.Ed. 2d 268 (1989), or by (2) presenting indirect evidence of discrimination that satisfies the three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Fasold v. Justice*, 409 F.3d 178, 183-84 (3d Cir. 2005); *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337-38 (3d Cir. 2002).

### 1. Direct Evidence of Age Discrimination

Where a plaintiff produces direct evidence of the employer's discriminatory animus, the Court must engage in the *Price Waterhouse* "mixed-motives" analysis. "Direct evidence" refers to "evidence sufficient to allow the jury to find that the decision makers placed a substantial negative reliance on the plaintiff's age in reaching their decision." *Glanzman v. Metro. Mgmt. Corp.*, 291 F.3d 506, 512 (3d Cir. 2004), *citing Fakete*, 308 F.3d at 388.

8

Sufficient direct evidence can include circumstantial evidence such as "'statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus' . . . even if [those] statements are not made at the same time as the adverse employment decisions." *Fakete*, 308 F.3d at 339 (internal citations omitted). If the proffered evidence is sufficient to establish the employer's discriminatory animus, the burden of proof shifts to the employer to show that its motives for discharging the plaintiff were mixed, meaning that the employer had legitimate non-discriminatory motives for terminating plaintiff's employment, in addition to the discriminatory motives. Thus, the employer must show that "it would have made the same decision if illegal bias had played no role in the employment decision." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 n.4 (3d Cir. 1995) (internal citations omitted).

In the case *sub judice*, Plaintiff's assertion of Ward Corp.'s discriminatory animus rests largely on the age-related statements made by McKay. The first piece of alleged direct evidence is McKay calling Plaintiff "senile" or "brain-dead" when asked for instructions related to various duties. Doc. No. 21, Def.'s Ex. 5 at 80-81; Doc. No. 21, Def.'s Ex. 6 at 87. The second piece of alleged evidence involves an incident where McKay asked Sonefelt to prepare a list showing the employees' birth dates, addresses, operator license numbers, and telephone numbers. Doc. No. 21, Def.'s Ex. 3. On another occasion, McKay allegedly made a comment about the rise in cost of hospitalization insurance due to Plaintiff's age and marital status. Doc. No. 21, Def.'s Ex. 5 at 102-103; Doc. No. 21, Def.'s Ex. 9 at 253-255; Doc. No. 28, Pl.'s Ex. 1 at 102-103; Doc. No. 28, Pl.'s Ex. 2 at 92-93. The third of McKay's statements involves a comment she made to Plaintiff after giving her the August 2003 disciplinary letter. Plaintiff alleges that while meeting with McKay to discuss the disciplinary letter on August 11, 2003, McKay told Plaintiff that McKay could replace Plaintiff with a younger employee who would cost less. Doc. No. 21, Def.'s Ex. 5

9

at 61, 109-110. Plaintiff also cites another incident with McKay as indicative of discriminatory animus. Plaintiff states that when she returned to work in January 2003, after having a tooth removed, Moyer made a comment in front of McKay about the missing tooth signifying old age and McKay found the comment funny and laughed. Doc. No. 21, Def.'s Ex. 5 at 86-87; Doc. No. 28, Pl.'s Ex. 2 at 56-57, 86-87.

As stated earlier, direct evidence can also include statements made by non decision-makers who were involved in the decision-making process for dismissal. *See Glanzman*, 391 F.3d at 513-514. Although McKay was not the decision maker in regards to Plaintiff's termination, there is no doubt that McKay was involved in the decision-making process and made the recommendation to Michael Ward to dismiss Plaintiff. Doc. No. 21, Def.'s Ex. 7 at 100 (Ward discusses the time period in which McKay approached him about firing Plaintiff). Defendant consistently stated that the decision to terminate Plaintiff was based on McKay's "personal observations" of Plaintiff (Doc. No. 21, Def.'s Br. at 19-20), including McKay's views that Plaintiff: 1) abused the privilege of having a car to run errands, 2) had performance problems in customer service; and 3) was unable to perform her accounting and notary duties. Doc. No. 21, Def.'s Br. at 17, 20. The record also supports that McKay played a significant role in the decision-making process. *See* Doc. No. 21, Def.'s Ex. 41 (email in which McKay writes to a Human Resources representative about preparing the August 2003 disciplinary letter, stating that ". . . in the near future I can elimate [sic] this last problem internally and hire a qualified competent candidate to assist me . . . . She lacks so many qualities and traits personally, not to mention accounting skills, that I do not have any use to keep her on board."); *see also* Doc. No. 21, Def.'s Ex. 8 at 157-159 (McKay's testimony in which she stated she was dissatisfied with Plaintiff's performance and that she made the recommendation to bring in another person); Doc.

10

No. 21, Def.'s Ex. 46 (McKay's note to the EEOC (Equal Employment Opportunity Commission) describing the reasons for Plaintiff's dismissal); Doc. No. 21, Def.'s Ex. 42 (the August 2003 disciplinary letter, prepared and signed by McKay).

The Court finds that, despite McKay's involvement in the decision-making process, the direct evidence proffered by Plaintiff is not enough to show that her age was a motivating factor in Ward Corp.'s decision to terminate her employment. Plaintiff cites the *Fakete* and *Glanzman* decisions as supporting her assertion that McKay's statements raise enough of an inference for a finder of fact to find that the Plaintiff's age was a likely determinative factor in dismissal.

In *Fakete*, the Third Circuit held that the statement by a decision maker to the plaintiff that he was "looking for younger single people" and that consequently the plaintiff "wouldn't be happy [to work for the employer] in the future" was enough to show that age was a determinative factor. 308 F.3d at 338. The statement in *Fakete* was sufficient to satisfy *Price Waterhouse* because it was made as a direct response to Plaintiff's question about his "prospects for continued employment" with his employer. *Id.* at 340. Similarly, in *Glanzman*, the court found that a decision maker's statement to the plaintiff that he was going to replace her with a "young chippie" who was better endowed sufficed as direct evidence of discrimination.[4] 391 F.3d at 513-14. This statement constituted direct evidence because it reflected an inference that the reason the statement was made was, in part, because of the desire to terminate the plaintiff because of her age.

Plaintiff argues that all of McKay's alleged statements dealt directly with Plaintiff's work. The record does not support Plaintiff's assertion. The incident involving Jack Moyer's statement about Plaintiff's missing tooth occurred after Plaintiff had just returned from her

---

[4]Although finding that the statement to replace the plaintiff was sufficient evidence of discrimination, the court in *Glanzman* ultimately held that the Defendant employer had met its evidentiary burden by proving that it would have dismissed the plaintiff even if age had not been a consideration. 391 F.3d at 515.

11

appointment. She happened upon Moyer and McKay when Moyer made the statement. He did not make the statement in relation to Plaintiff's work or performance. Furthermore, Moyer's statement does not serve as direct evidence since Moyer was not the decision maker and he was not involved in the decision-making process. *See Glanzman*, 391 F.3d at 514 ("*Price Waterhouse* explicitly states that statements made by non-decision makers or by a decision maker unrelated to the decisional process itself are not direct evidence") (internal citations omitted).

The same can be said of McKay's alleged statement about Plaintiff's age and marital status affecting the cost of insurance. Although acknowledging in her testimony that she was not the only Hertz employee over 40, Plaintiff argues that the insurance statement surpasses the realm of office banter. Doc. No. 21, Def.'s Ex. 5 at 93-95. The Court agrees that such a statement as that allegedly made by McKay, when combined with the surrounding conversation about insurance, appears to be more than office banter; however, the statement is not enough to raise the inference of discrimination. This statement cannot be construed as direct evidence of age animus as a fact-finder could not reasonably read the statement to imply that Plaintiff's age was the sole reason for Ward Corp. not being able to get reasonable insurance rates.

As for Plaintiff pointing to McKay's request for the employees' birth dates, Plaintiff attributed discriminatory animus to this question simply because the question related to her date of birth and the fact that she had never been asked that during her time at Ward Corp. Doc. No. 21, Def.'s Ex. 3; Doc. No. 21, Def.'s Ex. 5, 82-83. An inquiry or request for an employee's date of birth is not age discrimination. *See Glanzman*, 391 F.3d at 513 (wherein a supervisor made an inquiry into the employee's retirement plan and the court found that it was not direct evidence of

age discrimination). Such reasoning does not suffice as direct evidence of discrimination based on age.

During their testimony, McKay and Moyer deny making discriminatory age-related statements to Plaintiff. Moyer states that he does not remember any incidents involving Plaintiff and her tooth removal:

> Q.   Do you recall an incident that occurred on January of 2003, involving Ms. Garner having some --- a tooth removed?
> A.   No.
>
> Q.   You don't recall --- do you recall an incident where you allegedly make a remark about . . . old and/or senile people loosing [sic] their teeth?
> A.   That [sic] a definite no.
>
> Q.   Do you remember her joking about anything like that?
> A.   No.

Doc. No. 21, Def.'s Ex. 11 at 37.

McKay also testified as follows:

> Q.   Did you ever tell the Plaintiff --- say to the Plaintiff are you senile or just brain dead?
> A.   No.
>
> Q.   Did you ever tell the Plaintiff that she could be replaced by someone younger who could learn faster?
> A.   No.
>
> Q.   Do you recall in your presence Mr. Moyer ever making a joke about old people losing their teeth after Ms. Garner had a tooth removed and you laughing along with him?
> A.   No.
>
> Q.   You made discussion with other employees about insurance. Do you ever recall telling Ms. Garner that her age prevented them --- the employer from getting cheaper insurance?
> A.   No. I did not. . . .

Doc. No. 21, Def.'s Ex. 8A at 252-253.

13

Even though the Court, at the summary judgment stage, cannot make credibility determinations as to McKay's and Moyer's denials, further examination of the record does not reveal any compelling direct evidence of age-based discriminatory animus. Plaintiff has not shown that her age served as a determinative influence in the resulting termination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S. Ct. 2097, 2105, 147 L. Ed. 2d 105, 116 (2000). Plaintiff attested to her uncertainty as to whether McKay's actions and Ward Corp.'s decision were based on age. As stated previously, Plaintiff testified that she met with McKay in August 2003 to discuss the disciplinary letter. Doc. No. 21, Def.'s Ex. 4 at 75. During the meeting, she quizzed McKay about the reasons behind McKay's decisions to take away her duties. *Id.* Plaintiff indicated that McKay did not give her a reason for the cessation of her duties, although she ultimately was not sure if McKay had said that her decision was based on Plaintiff's age or on the fact that her co-workers were younger. *Id.* When asked whether two of her co-workers, Sonefelt and Benson, were not terminated because they were younger, Plaintiff merely asserted that it was "because they were treated differently." Plaintiff felt that her co-workers were treated more favorably; as an example of this more favorable treatment, Plaintiff perceived that when her co-workers asked questions, McKay readily responded to them and allowed them to repeat the questions if they did not understand instructions. *Id.* Indeed, Plaintiff intimated that Sonefelt and Benson were retained not necessarily because they were younger but because "it wouldn't take them as long to learn as it did [Plaintiff]." *Id.* at 110-111.

Thus, the Court finds that Plaintiff has failed to present direct evidence such that a reasonable fact-finder would find that age was a substantial factor in the decision to terminate her employment. Plaintiff has not shown that McKay's alleged statements constitute the type of direct evidence that can "fairly be said to directly reflect the alleged unlawful basis" for her

14

termination. *Fakete*, 308 F.3d at 339. The Court will now proceed with examining whether Plaintiff has succeeded in presenting indirect evidence of age discrimination as mandated by the framework of *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)

## 2.    Indirect Evidence of Age Discrimination

Where a plaintiff has not succeeded in presenting direct evidence of age discrimination, the plaintiff can still prevail under the burden shifting analysis of *McDonnell Douglas*. Under *McDonnell Douglas*, a plaintiff must present a *prima facie* case by proving that (1) she is age forty or older; (2) her job performance met the employer's legitimate expectations; (3) she was terminated from her position; and (4) she was replaced by a sufficiently younger person or a younger, similarly situated employee was treated more favorably such that a reasonable inference of age discrimination was created. *Shontz v. Rite Aid of Pa., Inc.*, 2008 WL 793878 (W.D. Pa. 2008) *(citing Simpson v. Kay Jewelers*, 142 F.3d 639, 644 (3d Cir. 1998)).

If a plaintiff succeeds in her initial showing, then the burden shifts to the defendant-employer to provide a legitimate non-discriminatory reason for terminating the plaintiff. *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). If the defendant meets this relatively light burden, then the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the employer's articulated reason is a pretext for discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981). ·

There is no dispute that Plaintiff falls within the protected class (she was 60 years old when she was terminated) or that she suffered an adverse employment action when she was discharged. However, Defendant argues that Plaintiff is not able to establish a *prima facie* case for two reasons: (1) she was not qualified for the accountant position she held during her tenure

15

at Ward Corp.; and (2) she was not replaced by a sufficiently younger person to create an inference of discrimination. The Court will first address the issue of whether Plaintiff was replaced by someone younger.

Defendant argues that Plaintiff was not "replaced *per se*" by Silvis because Silvis had "significantly great[er] financial responsibilities than Plaintiff." Doc. No. 21, Def.'s Br. at 12. The Court finds Defendant's argument to be disingenuous, as McKay testified that Silvis' responsibilities included those that had previously been assigned to Plaintiff. Doc. No. 21, Ex. 8A at 193-196. Contrary to Defendant's argument that Plaintiff's former position was distributed among two remaining office workers, McKay testified to Silvis taking on Plaintiff's former responsibilities, including the handling of Ward Corp.'s bank loan, the posting of depreciation figures for Ward Corp.'s vehicle fleets and buildings and the handling of the pay airport commissions. *Id.* Defendant's argument that Silvis did not replace Plaintiff simply because she had other duties not previously assigned to Plaintiff is unconvincing. Based on the foregoing, it is evident that Plaintiff was replaced by Silvis, a younger individual.

Defendant also argues that Plaintiff was not qualified for the position of accountant; this argument is plagued by conflicting and circuitous assertions. It would appear that Defendant is trying to assert that Plaintiff's position as accountant was actually two separate positions, that which she held before McKay's arrival and the position she held after McKay's arrival. Defendant points to the fact that when McKay arrived at Ward Corp., she identified the need for an accountant at the Hertz franchise. Doc. No. 21, Def.'s Br. at 13. Defendant then goes on to state that "no current employee could fulfill that function – certainly not Plaintiff even though that was her designated title." This dubious statement ignores that Plaintiff was eventually found to be suitable for the role (at least initially), in part due to her duties prior to McKay's arrival.

16

Thus, the Court finds that the characterization of Plaintiff's duties (before and after McKay's arrival) during her tenure with Ward Corp. must be clarified.

As previously established, Plaintiff started working for Defendant on February 17, 1992. Plaintiff testified that when she started working for Ward Corp., her supervisor at the time, Jim Boito, hired her as a rental clerk/counter clerk.[5] Doc. No. 21, Def.'s Ex. 4 at 130-132. While the record does not offer a clear timeline of the evolution of Plaintiff's titles from rental clerk to bookkeeper to office manager to accountant, there is no dispute that Plaintiff's title, before termination, was that of accountant. *See* Doc. No. 21, Def.'s Ex. 16; *see also* Doc. No. 21, Def.'s Ex. 17 (documentation Plaintiff completed while holding the title of bookkeeper). The record establishes that Plaintiff's duties evolved over time to include increasing bookkeeping and notary responsibilities. The record also makes it clear that Plaintiff's actual duties did not accurately reflect her titles.

Plaintiff's duties, starting in 1992, initially included doing the bank deposits, taking care of the mail, performing customer service, and running errands. Doc. No. 21, Def.'s Ex. 4 at 23-25. During this point in time, the bookkeeper was Marlene Jones (hereinafter "Jones") who resigned after Ward Corp. introduced new accounting software in 1994. *Id.* at 31. After Jones' departure, her duties were divided among some of the remaining staff, including Plaintiff. *Id.* Plaintiff assumed the role of inputting the accounting entries, but was only able to do so after being given the proper values. *Id.* at 35. Troxel, who assumed the accounting duties such as compiling financial statements for all of the Ward Corp. enterprises, gave Plaintiff the values she was to enter into the accounting software. *Id.* Troxel also generally supervised Plaintiff's deliverables. *Id.*; *see also* Doc. No. 21, Def.'s Ex. 5 at 73 (establishing that Troxel did the

---

[5] The Court notes that "Jim Boytoe", "Jim Boito" and "Jim Baits" are used to refer to the same man that was Plaintiff's former supervisor. The Court will simply refer to him as "Jim Boito".

accounting for all of the enterprises). *See* Doc. No. 21, Def.'s Ex. 6 at 8, 14, 16, 21, 27, 35, 46 (establishing that Troxel, in effect, operated as Plaintiff's supervisor with regard to Plaintiff's bookkeeping entries and that the accounting software was primarily Troxel's responsibility. *See* Doc. No. 21, Def.'s Ex. 6 at 40, 42 (establishing that Troxel had a degree in accountancy, and that Fusco at times provided Plaintiff with the information she was to enter into the accounting software).

The record also establishes that despite her title of accountant, Plaintiff was never considered to actually be an accountant. Ward testified that he understood Plaintiff's duties to be no more than that of a basic bookkeeper and not that of an accountant. Doc. No. 21, Def.'s Ex. 8 at 12; Doc. No. 28, Pl.'s Ex. 6 at 6. Fusco, Plaintiff's former supervisor, also testified that Plaintiff's duties included basic bookkeeping; he did not consider Plaintiff to be an accountant and that was never her position. Doc. No. 21, Def.'s Ex. 6 at 35-36, 38.

When McKay arrived in July 2002, Charlene Troxel continued with her duties at the warehouse operation and did not move to the Hertz franchise with Plaintiff and McKay. McKay testified that she was given a job-title list that recorded Plaintiff as an accountant; however, the Court notes that the list purported by Defendant to represent such an assertion contains no such information. See Doc. No. 21, Def.'s Ex. 13 (which is not a list of Ward Corp.'s employees during McKay's arrival in 2002, but rather a list of Ward Corp.'s employees as of August 2006). *See* Doc. No. 28, Pl.'s Ex. 10, at 2 (while not the list that McKay states she received, this list describes Plaintiff's title as accountant and is dated October 30, 2002).

Contrary to Plaintiff's assertion that McKay's assignment of accounting duties to Plaintiff was based on a willful refusal to inquire into her previous duties, McKay testified that there were no personnel records available to her and she had to create new ones. Doc. No. 21,

Ex. 8 at 32-33. McKay did not know of Charlene Troxel's accountant role and was not given any job descriptions. *Id.* at 27-28, 30. She utilized Defendant's payroll log to determine people's positions. Doc. No. 21, Ex. 8 at 30. McKay was not informed of Plaintiff's duties and she had no discussion with Plaintiff in regards to her background or work experience. Doc. No. 21, Ex. 8 at 29-30, 39. However, McKay did observe Plaintiff while Plaintiff performed bookkeeping/data-entry duties in order to ascertain Plaintiff's capabilities. Doc. No. 21, Ex. 8 at 38-39. It was only after going through this process that McKay assigned the accounting duties to Plaintiff.

Based on the foregoing, the Court can now move forward with examining the issue of whether Plaintiff was qualified for the position she held at the time of discharge. As stated previously, establishing that a plaintiff is qualified requires a showing that the plaintiff was "'performing [her] job at a level that met [her] employer's legitimate expectations at the time of [her] discharge." *Detz v. Greiner Industries, Inc.*, 346 F.3d 109, 119 (3d Cir.2003) (quoting *Eible v. Houston*, 1998 WL 303692 at \*5 n.4 (E.D. Pa. April 21, 1998)). The record establishes that despite holding the same nebulous title of accountant before and after McKay's arrival, Plaintiff's responsibilities grew. Her duties as a bookkeeper composed primarily data entry and inputting values that were provided to her by her supervisors (primarily Troxel and frequently Fusco). She was also responsible for daily petty cash sheet reconciliation, license plate renewals, handling the accounts payable, and the bank reconciliation process. Doc. No. 21, Def.'s Ex. 8 at 66-83, 93, 100 (McKay testifying to the duties Plaintiff held before her arrival).

Plaintiff appears to have been able to perform these duties in an adequate manner. Fusco testified that he did not have any problems with Plaintiff performing her duties as a bookkeeper. Doc. No. 21, Def.'s Ex. 6 at 50; Doc. No. 28, Pl.'s Ex. 5 at 50. Plaintiff made no mistakes in her

posting duties and Troxel did not complain to Fusco of Plaintiff making any posting errors. Doc. No. 21, Def.'s Ex. 6 at 47-48; Doc. No. 28, Pl.'s Ex. 5 at 47-48. Fusco also observed that Plaintiff did not make any errors with regard to the receivable printouts. Doc. No. 21, Def.'s Ex. 6 at 49; Doc. No. 28, Pl.'s Ex. 5 at 49. Plaintiff handled her posting and mailing duties to Fusco's satisfaction. Doc. No. 21, Def.'s Ex. 6 at 53; Doc. No. 28, Pl.'s Ex. 5 at 53. Ward also testified that he did not receive any complaints about inaccuracy in Plaintiff's bookkeeping prior to the arrival of McKay. Doc. No. 21, Def.'s Ex. 7 at 59; Doc. No. 21, Pl.'s Ex. 6 at 59. Thus, the record shows that Plaintiff was initially qualified for the position of accountant, as defined by her duties prior to McKay's arrival.

Plaintiff's former duties (before McKay's arrival) were primarily transferred to Benson. *See* Doc. No. 28, Pl.'s Ex. 14 at 4 (a list of Benson's duties); Doc. No. 21, Def.'s Ex. 8 at 66-83, 93, 100. Plaintiff's duties after McKay's arrival included compiling monthly vehicle reports, seeing to the Ward Corp.'s banking payment postings and reconciliations, handling depreciation postings, processing vehicle accident claims including the collection of revenue and coordinating requests for shuttle drivers. Doc. No. 28, Pl.'s Ex. 14 at 2. See also Doc. No. 21, Ex. 8 at 53.

As previously discussed, McKay was not given any job descriptions of Ward Corp. employees when she first arrived in July 2002. Furthermore, she took steps to observe the employees while they performed their former duties. McKay testified that the reason she assigned the task of handling the depreciation postings to ·Plaintiff was that Plaintiff "knew where the numbers came from" when she asked Plaintiff about certain financial statements. Doc. No. 21, Def.'s Ex. 8A at 134. McKay "assumed that based on what [Plaintiff] was explaining . . . she had a thorough knowledge of where they came from, where they were derived from and, therefore, how they were on the financial statements." *Id.* McKay indicated that the

20

task would be simple enough to complete with a "basic bookkeeping, accounting background," a background of which Plaintiff had an extremely limited exposure due to her previous basic bookkeeping duties. Doc. No. 21, Def.'s Ex. 8A at 140. Thus, the Court finds that Plaintiff was *initially* qualified for the position of accountant as defined by McKay's assignment of duties.

Ultimately, Plaintiff was terminated. Defendant argues that Plaintiff was discharged because she was not performing her job at a level that met McKay's expectations. McKay found that Plaintiff was not able to perform the duties assigned to her: making mathematical computations, tracking missing miles for Ward Corp. vehicles, entering the right data into the ledger account, following the training provided, and improving poor relations with co-workers and customers. Plaintiff does not dispute that she was not able to perform the tasks required of her; while it appears that Plaintiff required more instruction than Benson or Sonefelt, Plaintiff still asserts that Defendant's expectations were not legitimate.

Plaintiff points to several factors to show that McKay's expectations were not legitimate. McKay stated that Plaintiff had made "hundreds" of errors in regards to her title work, and that Plaintiff's paperwork sent to PennDOT was constantly returned to Ward Corp. for corrections. Doc. No. 21, Def.'s Ex. 8 at 73. This runs contrary to Jack Moyer's testimony, who dealt largely with Plaintiff's title work due to his role as the car salesman. Moyer testified that initially, Plaintiff did not do the title work for him even though she was a notary. Doc. No. 21, Def.'s Ex. 12 at 17-22. The title work was given to another entity. *Id.* Plaintiff did not start to do title work for Moyer until after McKay's arrival. Doc. No. 21, Def.'s Ex. 12 at 22. Plaintiff's duties with regard to the title work were to fill out the form and pass it to Moyer. Doc. No. 21, Def.'s Ex. 12 at 24. Moyer would, in turn, review the form with all the information, and if completed properly, would return it to Plaintiff for the notary stamp. *Id.* Moyer did complain to McKay of

21

Plaintiff's mistakes in the title work, but he testified that he spoke with McKay about two or three times. Doc. No. 21, Def.'s Ex. 12 at 26. Moyer stated that he could not recall definitively if the level of Plaintiff's errors was significant, but he indicated that PennDOT returned title work even with the slightest error (i.e. a customer's initial was missing). Doc. No. 21, Def.'s Ex. 12 at 26, 32. Furthermore, Moyer stated that of the three instances of mistakes, only one of the instances required the title work to be corrected more than once. Doc. No. 21, Def.'s Ex. 12 at 34-35.

Plaintiff also argues that the delineation of duties was not as clear as indicated by McKay's task list (Doc. No. 28, Pl.'s Ex. 14), and that McKay continuously held Plaintiff responsible for tasks assigned to other employees. As indicated earlier, Plaintiff's Exhibit 14 consists of task lists created for Sonefelt, Benson and Plaintiff. It is from this list that Plaintiff was assigned her aforementioned duties including processing and handling vehicle accident claims, compiling monthly vehicle reports, dealing with Ward Corp.'s banking payment postings and coordinating requests for shuttle drivers.     The record, however, contains conflicting testimony by McKay where in some instances she stated that the job duties on the list remained the same, while in other instances she testified that Plaintiff was responsible for work that was not necessarily assigned to her. For instance, McKay testified that she did not assign the task of handling factory recall of vehicles to Plaintiff, although she expected Plaintiff to have dealt with it simply because Plaintiff received and distributed all the incoming mail. Doc. No. 21, Def.'s Ex. 8 at 104. Another instance involved the overpayment of the Benner Township tax, for which McKay held Plaintiff solely responsible. Doc. No. 21, Def.'s Ex. 8A at 199. The administration of the Benner Township tax had started before McKay's arrival when the lease was entered into in 1999. McKay testified that she held Plaintiff responsible for the mishandling of the Benner

22

Township tax affair simply because she filled in the forms, compiled the documents and "supported the signatures going on the checks [and] submitted it for several years to Benner Township authority [sic]." Doc. No. 21, Def.'s Ex. 8A at 199. The record establishes that the majority of Plaintiff's duties prior to McKay's arrival involved entering data based on instructions from her supervisors, primarily Fusco and Troxel. *See* Doc. No. 28, Pl.'s Ex. 1 at 52-53; Doc. No. 28, Pl.'s Ex. 2 at 69-71. McKay's statement was made despite the fact that she had acknowledged that Plaintiff (Fusco and McKay herself) did not have the clearance to authorize checks larger than $1,000. Doc. No. 21, Def.'s Ex. 8 at 41. The Court finds that the evidence presented by Plaintiff as to McKay's (and subsequently Ward Corp.'s) expectations for her duties is enough to raise an inference of discrimination sufficient to defeat summary judgment. The evidence proffered by Plaintiff is sufficient to establishing her *prima facie* case of intentional discrimination through indirect evidence. Therefore, for present purposes, the first element in the *McDonnell Douglas* burden-shifting framework to establish age discrimination has been met.

Accordingly, Defendant Ward Corp. must now provide a non-discriminatory legitimate reason for dismissing Plaintiff from her accountant position. *Hicks v. Tech Industries*, 512 F.Supp.2d 338, 346 (W.D.Pa. 2007). Although this burden is "relatively light", (see *Fuentes*, 32 F.3d at 763), the Court finds that Ward Corp. has not satisfied this element of the *McDonnell Douglas* analysis due to the aforementioned discrepancies in the record relating to Plaintiff's duties and what was expected of her in the role as "accountant". Def.'s Br. at 17. Ward Corp. states that it terminated Plaintiff, essentially, for poor performance. However, the record shows that Plaintiff's mistakes, as relating to her title work, were significantly less than the "hundreds" of errors espoused by McKay. Furthermore, the exact contours of her duties took on various

23

amorphous forms as attested to by McKay (in this regard, the Benner Township Tax incident serves as a prime example). Accordingly, the Court finds that Ward Corp. has not proffered a legitimate, non-discriminatory reason for terminating Plaintiff.

If Ward Corp. had succeeded in advancing a legitimate, non-discriminatory reason Plaintiff's discharge, it would fall to Plaintiff to show that Ward Corp.'s proffered reason for taking the adverse action against her was merely a pretext for the real reason behind the adverse action, namely age discrimination. *Fuentes*, 32 F.3d at 763. Plaintiff's evidence must be sufficient enough to lead a reasonable factfinder to find that Ward Corp.'s characterization of Plaintiff's poor performance was mere pretext. *St. Mary's Honor Ctr.*, 509 U.S. at 515.

Establishing pretext requires Plaintiff to "submit evidence which (1) casts doubt upon the legitimate reason proffered by the employer such that a fact-finder could reasonably conclude that the reason was a fabrication; or (2) would allow the fact-finder to infer that discrimination was more likely than not a motivating or determinative cause of the employee's termination." *C.A.R.S. Protection Plus Inc.*, 527 F.3d 358, 370 (3d Cir. 2008) (citing *Fuentes*, 32 F.3d at 764 and *Chauhan v. M. Alfieri Co., Inc.*, 897 F.2d 123, 128 (3d Cir. 1990)). In other words, Plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them unworthy of credence . . . ." *Fuentes*, 32 F.3d at 765. In this third step of the *McDonnell Douglas* test, there is sufficient evidence that would allow for an inference that Plaintiff's discharge was motivated by age animus. The evidence, as present in the record, goes beyond a simple disagreement with Ward Corp.'s reasons for terminating her. The lack of clarity in terms of her duties and position and the mis-characterization of her

24

performance are sufficient to undermine the credibility of the reasoning proffered by Ward Corp.

*Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 283 (3d Cir.2001).

## V.    CONCLUSION

For the reasons set forth in the foregoing analysis, the Court shall deny Defendant's Motion for Summary Judgment. An appropriate Order follows.

**AND NOW**, this 20th day of October, 2008, in consideration of the Defendant's Motion for Summary Judgment (Doc. No. 19) and in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Defendant's Motion is DENIED.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**